# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 06 2019, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John Andrew Goodridge
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles James Popp, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent.* | November 6, 2019 <br><br> Court of Appeals Case No. <br> 19A-PC-324 <br><br> Appeal from the Vanderburgh <br> Superior Court <br><br> The Honorable Mary Margaret <br> Lloyd, Judge <br><br> Trial Court Cause No. <br> 82D03-1307-PC-5 |

**Barnes, Senior Judge.**

# Statement of the Case

[1]     Charles Popp appeals the post-conviction court's denial of his petition for post-conviction relief. We affirm.

# Issue

[2]     Popp raises two issues for our review, which we restate as one: whether the post-conviction court erred when it concluded that Popp was not denied the effective assistance of trial counsel.

# Facts and Procedural History

[3]     The underlying facts, as stated in Popp's direct appeal, are as follows:

> When A.R. was twelve or thirteen, her mother worked with Popp's girlfriend, and eventually the families became friends. At some point, Popp gained custody of four of his nieces and nephews, and A.R. would come over to babysit them. In December of 2009, when A.R. was fourteen, she fell asleep on Popp's couch. Popp came up next to her and put his hand down her pants, telling her that it was okay. A.R. ran to the bathroom and Popp told her that if she told anyone, he would kill her. A.R. continued to go to Popp's house after this, and the incidents continued and escalated, with Popp forcing A.R. to participate in oral sex, and attempting intercourse with her, despite her screaming for him to stop. A.R. kept a diary specifically of the incidents with Popp, and referred to this diary at trial in order to recall exactly what Popp did to her on a given date. Eventually, around the summer of 2010, A.R. was able to come up with an excuse to stop going to Popp's house. In April of 2011, A.R. spoke to a school resource officer and then to a detective about Popp. The detective then questioned Popp at the police station

and recorded the interrogation. On April 18, 2011, Popp was charged with twenty-one counts stemming from these incidents.

In August 2011, Popp deposed A.R. It appears that at the deposition Popp first learned that A.R. had kept a second diary, and Popp claims that there was an unrecorded discussion following the deposition in which someone indicated that the second diary might be of interest to Popp. The next month Popp filed a pretrial discovery motion requesting a copy of the second diary. Thereafter, it was learned that the second diary had been destroyed. There was conflicting testimony about both when the second diary was destroyed, and whether it might have had any information regarding the incidents with Popp. A.R.'s youth pastor, Hugh Crowe, told a detective that A.R. had destroyed a diary during an exercise in which members got rid of something from their past, and that the exercise had taken place in the summer of 2011. In an affidavit and at trial, Crowe testified that the exercise had taken place in March of 2011, and that A.R. had told him that the diary contained some information about what happened to her in her case. At trial, A.R. referenced the diary that she kept of the incidents in order to remember the details of each event, and that diary was admitted into evidence. She also testified that she kept a separate second diary in which she had written about normal daily events like school and sports, but not the incidents with Popp. A.R. testified that she had destroyed the second diary in October or November of either 2010 or 2011; she did not remember which year. In both January and March of 2012, Popp filed motions to dismiss the case or in the alternative to exclude evidence or testimony regarding A.R.'s diary; both motions were denied.

A jury trial was held in March 2012. . . . The jury found Popp guilty of sexual misconduct with a minor as a Class C felony, nine counts of sexual misconduct with a minor as Class B felonies, and intimidation as a Class A misdemeanor; Popp was

found not guilty on the remaining ten counts. The court sentenced Popp to a total of fifty-five years executed.

*Popp v. State*, No. 82A01-1205-CR-197 (Ind. Ct. App. Feb. 20, 2013), *trans. denied*.

[4] On direct appeal, Popp argued that the trial court improperly denied his motion to dismiss the case or in the alternative to exclude evidence of A.R.'s second diary and improperly replayed for the jury, after deliberations had begun, the recording of his police interview. This Court affirmed his convictions in February 2013, and the Indiana Supreme Court thereafter denied transfer. *See id.*

[5] In July 2013, Popp filed his pro se petition for post-conviction relief. At some point, counsel appeared for Popp, and a hearing on his post-conviction petition was held on August 2, 2017. The court took the matter under advisement and allowed the parties to submit further evidence and proposed findings of fact and conclusions of law. After numerous extensions of time, the parties filed their post-hearing documents, and, on January 11, 2019, the court entered its findings of fact and conclusions of law denying Popp's petition for post-conviction relief. This appeal ensued.

## Discussion and Decision

[6] Popp contends the post-conviction court erred by concluding he failed to show that his trial counsel's performance was deficient. He argues that his counsel

was ineffective for failing to obtain and present exculpatory evidence and for conceding his guilt in closing argument.

[7] To the extent the post-conviction court has denied relief, the petitioner appeals from a negative judgment and faces the rigorous burden of showing that the evidence, as a whole, leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Harris v. State*, 762 N.E.2d 163, 166 (Ind. Ct. App. 2002), *trans. denied*. A post-conviction court's findings and judgment will be reversed only upon a showing of clear error — that which leaves us with a definite and firm conviction that a mistake has been made. *Kistler v. State*, 936 N.E.2d 1258, 1261 (Ind. Ct. App. 2010), *trans. denied*. In this review, findings of fact are accepted unless they are clearly erroneous, and no deference is accorded to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Witt v. State*, 938 N.E.2d 1193, 1196 (Ind. Ct. App. 2010), *trans. denied*.

[8] To prevail on a claim of ineffective assistance of counsel, a defendant is required to establish both (1) that counsel's performance was deficient and (2) that counsel's deficient performance prejudiced the defendant. *Johnson v. State*, 948 N.E.2d 331, 334 (Ind. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687-96, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To satisfy the first element, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that counsel's errors were so serious that the defendant was denied the counsel guaranteed by the Sixth Amendment. *Bethea v. State*, 983 N.E.2d 1134, 1138 (Ind. 2013). In order to satisfy the second

element, the defendant must show prejudice; that is, a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 1139. There is a strong presumption that counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment, and the defendant has the burden of overcoming this presumption. *Harris*, 762 N.E.2d at 168-69.

[9] Popp first claims that his trial counsel was ineffective due to her failure to obtain and present exculpatory evidence to the jury. Specifically, Popp, who had a penile piercing, asserts that counsel should have photographed him with the piercing in place and presented the photos to the jury in order to impeach the victim.

[10] Although photographs of Popp's piercing were not presented to the jury, the existence of the piercing was. In cross-examination of the victim, defense counsel asked:

> [Defense counsel]: Back during the time that you testified about . . .
>
> [A.R.]: Oh . . .
>
> [Defense counsel]: Okay. Did – does [Popp] have any piercing[]s?
>
> [A.R.]: Yes.
>
> [Defense counsel]: Where?

[A.R.]:  He had his tongue pierced.

[Defense counsel]:  His tongue.  Alright.  Anything else?

[A.R.]:  He might have had ear, but I don't remember.

[Defense counsel]:  Okay.  Anything – anything else?

[A.R.]:  No.

Trial Tr., Ex. Vol. 6, pp. 98-99.  Defense counsel also brought up Popp's piercings during direct examination of his fiancée:

> [Defense counsel]:  Does [Popp] have any piercing[]s?  Let me rephrase that, I didn't ask that very good or very well.  Back during the December 09 through June 2010, that period [of] time, did [Popp] have piercing[]s?
>
> [Fiancée]:  Yes.
>
> [Defense counsel]:  What?
>
> [Fiancée]:  Three ear holes and a Prince Albert piercing.
>
> [Defense counsel]:  What is a Prince Albert piercing?
>
> [Fiancée]:  A piercing on the tip of the penis.
>
> [Defense counsel]:  Did he have his tongue – an ear – I call it an earring – an earring in his tongue?

[Fiancée]:  Not during that time period.

*Id.* at 175.

[11]   In addition, during her closing argument, defense counsel highlighted the issue:

> I have to point out what I would say is fairly obvious.  She –
> when I asked [A.R.] about piercing[]s and she said [Popp] had a
> tongue piercing and maybe some in his ears and then from
> [Popp's fiancée] we find out that he has what's known as Prince
> Albert piercing, which is where he has a piercing at the tip of his
> penis.  I submit to you that's something that's going to be fairly
> obvious.  If – if [A.R.] is [sic] allegations are as she states.  That's
> not something you're going to not notice.

*Id.* at 229.  In its rebuttal, the State did not attempt to refute the existence of the

piercing but rather claimed that its existence did not matter:

> And – and hinging on this obscenity of – of piercing the penis
> and I – I remember when the testimony came and I saw some of
> the men up there, I mean you literally winced when you heard
> that description.  And, yeah, so did I.  But what does that have to
> do with anything.  Because if yeah he admitted to some of them
> [offenses] and she wants you to find him guilty of some of them,
> what difference does it make, if he had it in or didn't have it in.
> It makes no difference.  It makes no difference at all.

*Id.* at 234.

[12]   Finally, for purposes of post-conviction relief, Popp deposed his trial counsel.

In her deposition, she testified that the manner in which she dealt with Popp's

piercing was a matter of strategy.  She had practiced law for thirty-two years,

during which time she had served as a public defender and a magistrate. As a defense attorney, Popp's trial counsel had handled a minimum of fifty high level sex offense cases. When asked about dealing with the issue of Popp's piercing, she testified:

[Trial counsel]: We discussed it. We had trial testimony.

[PCR Counsel]: Now, in reviewing –

[Trial counsel]: I asked the complaining witness about it, both in deposition and at trial, and she didn't know what I was talking about. So we used part of that in argument that this is obviously – had he penetrated her, had he engaged in the activities that she's complaining of, she would have noticed this. There's no way, shape or form she would have not noticed this.

[PCR counsel]: In that regard, did you use any visual –

[Trial counsel]: No.

[PCR counsel]: -- depiction?

[Trial counsel]: No.

*****

[Trial counsel]: And it was uncontested that he had that piercing.

*****

[Trial counsel]: My belief, it was not necessary to go into detail because it came out in testimony and it was uncontested. So why I – my fear was I'm going to alienate everybody I've got on my side in this jury. I'm not going to do that.

[PCR counsel]: How would you alienate?

[Trial counsel]: By offending them, by berating a point that had already been proven. Once I prove a point, move on. I've proven it; let's go. [The prosecutor] even brought it up during his closing argument, talking about the disgusting piercing and the fact that yes, he had the piercing. It's been proven. It's disgusting. Thank God we didn't – something, you know, like thank God they didn't bring it out or whatever. So it was an uncontested issue, so there was no need.

*****

[Trial counsel]: I just – I stand by how I handled that issue.

[PCR counsel]: Okay.

[Trial counsel]: Because it did nothing – in my view, my strategy, it didn't do anything to take away what he admitted to in the statement. It may – the fact that we proved it went to [A.R.'s] credibility. So that helped get the not guilties and the lesser includeds on the things that we ultimately were able to be successful on.

Appellant's App. Vol. V, pp. 170-71, 172-74. In addition, Popp's trial counsel testified that "the jury really, really didn't like" the detective that worked on

Popp's case. *Id.* at 175. Moreover, counsel testified that the jury liked her but "didn't like the prosecutors at all." Appellant's App. Vol. II, p. 68.

[13] "Counsel is given significant deference in choosing a strategy which, at the time and under the circumstances, he or she deems best." *Wrinkles v. State*, 749 N.E.2d 1179, 1191 (Ind. 2001). The evidence here clearly shows that even if counsel had taken pictures of Popp's piercing, she would not have used them at trial because evidence of the existence of the piercing was presented to the jury and that evidence was uncontradicted; defense counsel specifically pointed to the existence of the piercing as a basis for questioning the credibility of A.R.; counsel testified that, having practiced law for several decades in the community, she determined that explicit details and/or photos of the piercing had the potential to offend the jury so she made the tactical decision not to go into great detail in describing the piercing and/or to introduce photos of the piercing; and counsel did not want to alienate a jury she perceived to be friendly to the defense. *See, e.g.*, *id.* at 1190-91 (finding that counsel were not ineffective for not presenting an insanity defense based on defendant's methamphetamine addiction because counsel presented evidence of defendant's addiction and its role in offenses and counsel believed it would be more harmful than helpful and would "put an additional layer of bad" on defendant). We cannot say the post-conviction court erred in concluding that Popp's trial counsel was not ineffective.

[14] For his second claim of ineffective assistance of trial counsel, Popp asserts that his counsel conceded his guilt in closing argument. Particularly, he refers to

counsel's comments regarding the offenses he admitted committing in his videotaped interrogation.

[15] Popp was charged with twenty-one counts stemming from his alleged actions with A.R., two of which were Class A felonies and the bulk of which were Class B felonies. As part of their investigation of these offenses, the police conducted a videotaped interrogation of Popp, in which he admitted to some of the charged offenses. At trial, the video was admitted into evidence and viewed by the jury.

[16] Popp does not specify in his brief the portion of counsel's closing with which he claims error; however, in closing counsel stated:

> I have to say this, I have to – I have to, because I want to maintain my credibility with you. I'm not suggesting and I'm not arguing that the State's burden wasn't met in some of the instances. Why else would I have gone through all of the counts and told you what I think the evidence was. But what I'm urging you to do is this, as a collective unit and as individual[s], I'm asking you to determine if you are satisfied beyond a reasonable doubt that each and every element was proven in each and every count separately, considering the evidence you heard and observed.
>
> *****
>
> And, I'm going to ask you to find [Popp] guilty only of those things that you are convinced that ha[ve] been proven beyond a reasonable doubt, considering all of the evidence. And of those things[] you are not convinced of, then I ask you to find him not guilty.

Trial Tr., Ex. Vol. 6, p. 228, 230-31.

[17]    In her deposition testimony for purposes of Popp's post-conviction claim, trial counsel testified:

>    [PCR counsel]: So your trial strategy was –
>
>    [Trial counsel]: Didn't happen, not guilty.
>
>    [PCR counsel]: Actual innocence?
>
>    [Trial counsel]: Yeah.
>
>    [PCR counsel]: At any time during the trial, did you modify that strategy?
>
>    [Trial counsel]: During closing argument, what I did was – we were able to – during testimony, during the evi [sic] -- during the evidentiary part of the trial, through cross examination as well as witnesses, we were able to put forward evidence that on dates alleged, these acts could not have happened. So it was not through testimony of Mr. Popp. It was through other witnesses. Whether it was cross examination or direct defense witnesses, we were able to show that on certain dates [sic] could not have happened because of X, Y, and Z. And I spent a lot of time then – because the counts, the 21 counts were not in sequential order. There were dates floating every which way. So it was very difficult for us – both the state, I would think, the Court, I – and I knew for the jury to keep track of what dates did things belong in. So then during closing argument I actually had taken all of the dates and put them in sequential order. And so in my argument – in closing argument, I said, okay, here is [sic] counts – like, for example, Counts I and IV, these are the dates for them. They belong together. If you'll remember, witnesses testified X, Y, and

Z, so we know that couldn't have happened because of this. And so what ultimately ended up was some of the dates were dates that coincided with the videotaped statement and that we were unable to bring forward, through cross examination or other witnesses, anything to contradict those.

So my argument in closing was she's not believable because of yada, yada, yada, that witnesses have shown us these couldn't have happened because of this, which leaves us with this handful of counts yada, yada, yada and dates. So if you're – if you find that those are his statements, his words are believable, we ask you to find him guilty only of those things that they've proven and that he admitted to.

[PCR counsel]: Did you have a discussion with Mr. Popp regarding that strategy in closing argument prior to?

[Trial counsel]: I think I did, yeah.

[PCR counsel]: Did he agree to it?

[Trial counsel]: Oh, no.

[PCR counsel]: What was his position?

[Trial counsel]: That's not me on the video. I didn't say those things.

[PCR counsel]: That's not him on the video?

[Trial counsel]: Correct.

[PCR counsel]: Wow. How did you deal with that?

[Trial counsel]: I said Mr. Popp, it is you. It's you talking. I don't know what else to say. And he maintained that was not him saying those words. He could not have said those words. That was not him.

Appellant's App. Vol. V, pp. 164-68. Trial counsel also explained:

[Trial counsel]: [Popp] never thought that it was him talking in the video.

[PCR counsel]: How did that [a]ffect your trial strategy? Or did it?

[Trial counsel]: Uh, I don't think it did affect it. My main trial strategy was going after the girl.

[PCR counsel]: Um, was it part of your strategy to try and get not guilty on certain counts and then accept –

[Trial counsel]: My strategy going into it was to try and get not guilty on everything.

*****

[Trial counsel]: [A]s a lawyer we also have credibility so in order to get [the jury] to understand, I'm not feeding them a line of bull you can't convict him on that stuff because we've shown you that it couldn't have happened, but you have to decide about these other things.

*****

[PCR counsel]: Do you think your closing argument was consistent with your trial strategy?

[Trial counsel]: Yeah.

[PCR counsel]: Do you think at any point you ever abandoned your trial strategy of "he didn't do it, it didn't happen?"

[Trial counsel]: I don't know if you abandon it or try to dance around it.

*****

[Trial counsel]: [Y]ou dance around so again you don't lose credibility because of it.

Appellant's App. Vol. II, p. 73, 67, 76.

[18] Undoubtedly, counsel was in a difficult position of reconciling her trial strategy of maintaining Popp's innocence with preserving the credibility she had established with the jury. Consequently, rather than ignore Popp's statement and risk diminishing her credibility with the jury, counsel acknowledged it, stating, "Let's talk about [Popp]'s statement for a minute. You know, we've got to talk about that." Trial Tr., Ex. Vol. 6, p. 225. She then painstakingly set about minimizing the damage Popp's statement caused by asking the jury to determine whether the statement was improperly obtained by the police—specifically mentioning "trickery" and "deceit"—and, if so, not to consider it; explaining to the jury that a guilty verdict may not be rendered solely upon a defendant's confession; and asking the jury to consider whether it was satisfied

beyond a reasonable doubt that each and every element was proven on each and every separate count, while specifically pointing out inconsistencies in A.R.'s testimony. *Id.* at 226.

The evidence does not show that Popp's trial counsel conceded his guilt. Rather, she made a strategic decision to acknowledge Popp's statement in a manner that not only preserved her credibility with the jury but also attempted to persuade the jury to consider Popp's innocence, in spite of his statement, especially concerning the offenses to which he did not confess. In straddling this fine line, counsel reminded the jury of the State's onerous burden, urged it to hold the State accountable on each and every element, and attacked the credibility of the victim. This strategy appears to have been successful because Popp was found guilty on only eleven of twenty-one charged offenses. We cannot say the post-conviction court erred in concluding that Popp's trial counsel was not ineffective.

## Conclusion

For the reasons stated, we conclude that Popp has failed to satisfy his burden of showing that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court.

Affirmed.

Najam, J., and Riley, J., concur.